RE FRANCIS McKEOUGH'S EST. *vs.* JOHN McKEOUGH, apt.

May Term, 1895.

Present: TAFT, TYLER, MUNSON, START and THOMPSON, JJ.

*Home Place—Construction of Will.*

A devise of "my home place where I now live" carries the testator's dwelling-house and its appurtenances, but not other dwelling-houses, occupied by his tenants, standing upon the same lot; though the testator acquired the title to the whole lot at one purchase and ever after held and controlled it as one parcel, using some portions of the leased premises for his own convenience.

APPEAL FROM PROBATE. Trial by court at the March Term, 1895, Chittenden County, *Ross,* C. J., presiding. Judgment that the appellant, by the clause of the will in question, took the use of the entire property. The estate excepted.

Parol evidence was introduced from which the court found the facts recited in the opinion. To the admission of all such evidence the estate excepted "on the ground that there was no ambiguity, latent or otherwise, which would permit its reception."

*H. S. Peck* and *Elihu B. Taft* for the estate.

There is no ambiguity in the language. "Home place" is synonymous with "homestead" and means the dwelling in which one resides. Webster Dict. "Home;" I Bouv. Law Dict. 754, and cases; I Abb. Law Dict. 567; *Cook* v. *McChristian,* 4 Cal. 23; *Ackley* v. *Chamberlain,* 16 Cal. 181; *Hoitt* v. *Webb,* 36 N. H. 158; *Austin* v. *Stanley,* 46 N. H. 52; *Barney* v. *Leeds,* 51 N. H. 253; *Backus* v. *Chapman,* 111 Mass. 386; *Gregg* v. *Bostwick,* 33 Cal. 220; *Estate of Delaney,* 37 Cal. 176.

The occupation necessary to create a homestead under the statute must be personal, not by tenant. *True* v. *Morrill,* 28 Vt. 672; *Philleo* v. *Smalley,* 23 Tex. 502.

· If the testator had used the words, "my home place," only, there would have been some room for contention, but when he added the words, "where I now live," his meaning was made perfectly clear.

I Redf. Wills (4 ed.) 502; Wigram's Prop. I and II. The intention of the testator must prevail, and must be gathered from his words. *Smith* v. *Bell*, 6 Pet. 74; *Tucker et. al.* v. *Seaman's Aid Society*, 7 Met. 188; *Spencer* v. *Higgins*, 22 Conn. 521; Redf. Am. Cas. on Wills, 552.

The description being clear, parol evidence was unnecessary and so inadmissible. I Redf. Wills (4 ed.) 503; Wigram's Prop. VII and cases cited in No. 4, 15, 16, 31, 35.

But if parol evidence was admissible, then upon the facts found the same construction must be adopted.

*W. H. Bliss* and *R. E. Brown* for the appellant.

Evidence is admissible to ascertain what is included in the description. I Jar. Wills, (ed. 1881) 447: (ed. 1893) 431, 432; *Maeck* v. *Nason*, 21 Vt. 115; Wigram's Prop. V; Schouler, Wills § 590; *Doe* v. *Collins*, 2 T. R. 498; *Good-title* v. *Southern*, 1 M. & Sel. 299.

The court below construed the will correctly. The "home place" includes the house and adjoining land,—the home farm. The fact that the testator rented certain tenements on the premises does not deprive the premises of their character of "homestead" or "home place." I Bouv. Law Dict. 754 and cases; *West River Bank* v. *Gale*, 42 Vt. 27; *Waggoner* v. *Ball*, 95 N. C. 323.

The court below having found in effect that it was the intent of the testator to include the whole lot and there being evidence in support of this finding, it is not open to revision here. *Backus* v. *Chapman*, 111 Mass. 386.

Munson, J. The testator's will contains the following clause: "After the decease of my said wife, I give to my son, John McKeough, the use, during his natural life, of my home place where I now live, on the west side of Champlain street in said Burlington." We are called upon to determine

what property is covered by the expression "my home place where I now live."

The testator lived in a house which stood upon the corner of a lot on which there were three other buildings, leased by the testator and occupied as dwellings. He obtained the lot at a single purchase in 1850, and held it without interruption until his death. At the time of his purchase there was a small house on the northeast corner of the lot, which he soon removed to the rear of the lot, where it has since stood. Soon after this he moved a building upon the northeast corner, which he fitted up as a dwelling and lived in during the remainder of his life. Some years later he moved a building onto the southeast part of the lot, and finished it into two tenements. A few years before his death he moved into the space between this double tenement and the house on the rear of the lot another building, which he used for two or three years as a barn and shop and then turned into a tenement. From this time until his death he had a shop in the basement of the southerly tenement in the double building.

The double tenement above mentioned was so located as to leave a passage of seven feet between it and the house occupied by the testator, and a passage of sufficient breadth for teams between it and the south line of the testator's land. A fence, which was substantially in alignment with the north side of this double tenement, extended from its northwest corner to the front line of certain structures occupied by the testator. These consisted of a chicken-house and chicken-yard which together extended from the north line of the testator's land to the line of the fence above described, and a coal and wood shed which adjoined the chicken-yard, but was south of the line of the fence and in the rear of the double tenement. It will be seen by this description that the house occupied by the testator stood in an enclosed yard, the south line of which was formed by the side of the double tenement and the fence, and the west line by the rear walls of the chicken-house and

yard. The only structure occupied by the testator outside of this was the coal and wood shed, which formed a continuous row with the chicken-house and yard.

The place enclosed as above stated could be entered from the street by a narrow gate between the testator's dwelling and the double tenement, and through a gate in the fence above described, located at the northwest corner of the double tenement. A necessary outbuilding, used in common by the testator and the occupants of the north part of the double tenement, stood in this enclosure. A cesspool connected with the testator's house and with both parts of the double tenement, was located under the fence already described. The occupants of the north part of the double tenement hung out their washings in this yard, and children from all the tenements were allowed to play there. Teams were never driven into it. The wagon entrance for all the buildings was through the passage between the double tenement and the south line of the testator's land. The testator worked up his wood and deposited his ashes in the open space between his wood-shed and the double tenement. He frequently piled considerable quantities of lumber and other material along the south and west lines of his land, near the two rear tenements. There was no other division of the lot than that above indicated, and no particular parts of the vacant space around the tenements were assigned to the different occupants.

The question presented suggests a consideration of the word "homestead." "Stead" originally meant place or spot. This meaning is now obsolete, except as preserved in compound words. Webster defines homestead as the home place. It is a house occupied by its owner as a dwelling, with the outbuildings and land used in connection with it. It is that part of a man's premises where he lives and has his home. Except as modified by limitations of value and questions of intent, the legal use of the term is the same as the popular use. So in determining what a devisee will take

under the expression "my home place where I now live," it will be well to consider what can be held as a homestead under the statutes.

It is said to be a general rule that buildings rented to others cannot constitute a part of the lessor's homestead, even though erected on the same lot with his dwelling.  70 Am. Dec. 350 note.  It is held that when one part of a double house, having distinct entrances but a common yard, is occupied by the owner, and the other part let to a tenant, only that part occupied by the owner can be held as his homestead.  *Tiernan* v. *Creditors*, 62 Cal. 286; *Dyson* v. *Sheley*, 11 Mich. 527.  In the first of these cases the statute protected the dwelling house in which the claimant resided; but, although there was only one building, the court said the claimant "did not reside in the structure which was occupied by his tenants."  In the second case, the statute exempted a limited quantity of land, with a dwelling house thereon and its appurtenances, owned and occupied by the debtor.  Here, the occupancy of the yard by the debtor and his tenants was in some respects like that had by the testator and the occupants of his double tenement of the space immediately in the rear of their houses.  A penstock used by both families was located in the middle of the lot.  A necessary outbuilding used by both stood entirely on the rented half.  The court considered that this use of the rented part of the yard by the owner did not indicate a right therein predominant over that of the tenant, and did not render the whole of the yard exempt.  A still greater similarity to the facts of the present case is found in *Ashton* v. *Ingle*, 20 Kas. 670: 27 Am. Rep. 197.  There, the debtor owned an L shaped piece of ground, the branches of which abutted on different streets.  The lot was fenced in one enclosure, but for convenience the court treated it as divided into two parcels.  On the south parcel were the debtor's dwelling house and outbuildings.  On the north parcel were two small houses occupied by his tenants.  A clothes-line

stretched from one of the tenements onto the south parcel, and was used jointly by the occupants of both parcels. A walk extended from the south parcel across the north parcel, which was sometimes used by the occupants of the south parcel. No importance was attached to this incidental use of the north parcel by the owner. The court considered that when houses were rented with the intention that they should become the homes of independent families, and they in fact became such homes, they could not longer be regarded as a part of the lessor's home; and confined the debtor's homestead to the south parcel. Mr. Thompson, in his work on Homesteads, deduces from the cases the rule that houses built for the purpose of being rented to tenants, and yielding to the owner a revenue separate from any use immediately connected with his dwelling, form no part of his homestead.

The use of a part of the basement of the double tenement by the testator as a shop cannot save the building from the operation of the rule above presented, as far as it may be considered applicable to a case like this. It is held that the letting of rooms in a building primarily used as the owner's dwelling will not deprive the building of its character as a homestead. 70 Am. Dec. 350 note. It must also be held that the owner's maintenance of a shop in a house primarily used for renting will not make the building a part of his homestead. Nor do the facts that the testator's only entrance for teams was in common with that of his tenants, and that he frequently deposited loads at points easily accessible from this common way, require that the whole property be considered his home place. This use was not inconsistent with a complete enjoyment of that portion of the property by others, in everything essential to an independent residence.

The decisions above referred to were made in controversies concerning the rights of debtors; and while they must be regarded as somewhat helpful in the construction of this devise, they are by no means necessarily determinative of it.

The question here is as to the testator's intention; yet that intention is to be gathered from the language used, with such aids in applying the language as the law permits and the case affords. But, having in mind that these decisions are of use only as they throw light upon the ordinary meaning and effect of the words employed, we think the expression "my home place, where I now live," can hardly be held to pass with the buildings occupied by the testator a group of tenement houses, although located upon the same lot as determined by unity of purchase and unbroken ownership. It is true that the testator lived upon the original lot on which all these dwellings were placed, and that if the conditions absolutely forbade its being regarded as separated into different lots, it would be necessary to consider it his home place as distinguished from other lots. But, when read in the light afforded by the character of the property, the language of the testator seems to call for a division subordinate to that effected by the intervening lands of another. It is not necessary to every division of a lot that it be separated by erections upon the land or the exact bounds of a deed or written lease. When the testator located upon different parts of this lot separate dwellings, he gave to those parts the character of different house lots, notwithstanding the unity of ownership and the lack of definite dividing lines. But he made a more marked separation of the lot into two parts by the different uses to which he devoted it. One part he fitted up to occupy as his home. The other part he fitted up for the purpose of renting. This distinction was emphasized by the fence which completed his private enclosure—the only fence upon the tract. The house in which he lived and the buildings prepared for use in connection with it, with his enclosed yard and his right of convenient access, fully answer the description of a home place. We think the language of the will points to that which the testator occupied as a home, to the exclusion of that from which he derived his income.

As we hold for the estate upon the facts reported, we assume without consideration the competency of all the testimony received against its objection.

*Judgment reversed and judgment that the appellant takes under the will the use of the house in which the testator lived and of the chicken-house and yard, and coal and wood-shed used by the testator, together with the yard separated from the other portion of the premises by the fence in connection with the chicken-house and yard, and the passage-way between the house above mentioned and the double tenement, with a right of access for teams to the space in the rear of the house as enjoyed by the testator; to be certified, etc.*

*Thompson,* J., dissents.